**LENNOX et al. v. TEXAS FARM BUREAU COTTON ASS'N.** (No. 3603.)

Court of Civil Appeals of Texas. Texarkana.
April 11, 1929.

Rehearing Denied April 18, 1929.

**414**

See, also, 257 S. W. 935; 283 S. W. 619; 296 S. W. 325, 328; 297 S. W. 743.

King, Mahaffey & Wheeler, of Texarkana, and Lennox & Lennox, of Clarksville, for appellants.

Aaron Sapiro, of New York City, C. K. Bullard, of Dallas, Long & Wortham, of Paris, and Robbins & Bailey, of Clarksville, for appellee.

HODGES, J. The appellants are partners engaged in the practice of law in Clarksville, Red River county, Tex., under the firm name of Lennox & Lennox, and were such before this controversy arose. They were also jointly interested in growing cotton through tenants on land which they jointly owned. On or about June 30, 1921, they signed a written agreement, then being circulated among the growers of agricultural products, for the purpose of forming a marketing association or corporation, under the provisions of an act of the Legislature adopted in 1921 and appearing as chapter 8, title 93, Revised Civil Statutes of 1925. The following are the material portions of that agreement:

"The undersigned propose to organize a nonprofit association, without capital stock, under the laws of the state of Texas for the purpose of promoting, fostering and encouraging the business of producing and marketing cotton co-operatively; for reducing speculation; for stabilizing the cotton markets; for co-operatively and collectively handling the problems of cotton growers; and for other pertinent purposes.

"We, the undersigned, in consideration of the premises and of our mutual undertakings and of the agreement of each and every other party hereto, do hereby agree as follows, each for himself and collectively for the express benefit of and as the association to be organized:

"1. We will become members of the Texas Farm Bureau Cotton Growers' Co-operative Marketing Association, a nonprofit association, without capital stock, to be organized under the laws of the state of Texas.

"2. The association may include in its membership any cotton grower in Texas, or the landlord or tenant or lessor or lessee of land in Texas on which cotton is grown, provided the landlord or lessor receive all or part of the rental in cotton.

"3. The affairs of the association shall be controlled by a board of twenty-three directors, and the office of the association shall be at Dallas.

"4. The members shall elect twenty directors from among the members actually residing and growing cotton in the districts here specified," etc.

"10. Every member shall pay an entrance or organization fee of ten ($10.00) dollars, except that all members of the Texas Farm Bureau Federation shall pay no entrance fee directly, but such fee shall be assumed to be paid for them by the Farm Bureau Federation in the work of organization.

"11. The association shall confine itself to the problems and marketing of cotton and cotton products only and for its members only. It shall have suitable articles of incorporation and by-laws stating the purposes and powers of the association; the rights and duties of members; manner of forfeiture of membership; value of property interests on withdrawal or expulsion from membership; value of property interest on withdrawal; and any other necessary, pertinent and important points of organization, as determined by the organization committee.

"12. The association shall be organized by the Texas Farm Bureau Federation, acting by and through an Organization Committee which shall take such steps as it may deem

advisable to secure subscribers for this agreement and members of the association.

"Members of Organization Committee: J. T. Orr (Chairman), Dallas. S. A. Lindsay, Houston. D. E. Lyday, Austin. W. B. Bizzell, College Station. Walton Peteet, Dallas. H. E. Childs, Itasca. C. A. Doose, Ballinger. G. E. King, Taylor. J. B. Fortson, Rice. Joe Hirsch, Corpus Christi. Clarence Ousley, Fort Worth. Ed. C. Lasater, Falfurrias. Henry Coit, Renner. J. L. McConkey, Wichita Falls. Leslie Elliott, Belton. D. M. Jones, Paducah. Shirley Gregg, Manor. J. D. Rogers, Navasota.

"13. (a) If by July 1, 1921, signatures of cotton growers or persons eligible to membership covering at least 1,000,000 [bales] of cotton of the 1920 crop shall not have been secured for this agreement, the organization committee shall so notify every subscriber at his address noted below, prior to July 15, 1921; and the subscriber shall have the right to withdraw and to cancel his signature and the agreement signed by him, by written notice mailed to the Secretary of the organization committee between July 15 and August 1, 1921.

"(b) If all signatures are not then withdrawn, the organization committee may then proceed with the organization and with the marketing plans under the marketing agreement, provided signatures covering at least 500,000 bales remain uncanceled.

"If signatures covering less than 500,000 bales so remain, the committee shall cancel all contracts.

"(c) If signatures of the growers of 1,000,000 bales shall be secured by the said date, July 1, 1921, then this agreement shall be binding upon all of the subscribers in all of its terms and there shall be no right of withdrawal whatsoever.

"(d) For all matters of production or signatures and for all statements of fact in connection herewith, the written statement of the organization committee, provided for in paragraph twelve hereof, signed by its chairman, shall be absolutely conclusive, with or without notice to the subscriber.

"17. (a) The subscriber agrees (1) to execute, when requested by the association, a marketing agreement in terms substantially the same as those set forth in the agreement herewith embodied; or (2) at the option of the board of directors, to be bound by the terms of the following marketing agreement.

"For such purpose signature to this association contract shall be deemed to all effects the same as signature to this said marketing agreement and as acceptance of each and every provision thereof and herein, as of the date of the exercise of such option by the board of directors. Notice thereof shall be mailed to each subscriber at his address as noted below.

"(b) The subscriber here applies for membership in the association when organized and expressly agrees that his signature to the association contract and to the marketing agreement herewith embodied, and to this application for membership shall be irrevocable, except as provided in paragraph 13; and that he so agrees, in order to induce other growers to sign this agreement for his benefit as well as their own general benefit and public welfare.

"Acceptance of this application for membership and of the marketing agreement shall be deemed conclusive, upon the mailing of the notice by the association; and such mailing and notice shall be conclusively established by the affidavit of the secretary of the association."

The marketing agreement referred to provides, among other things, that the association agrees to buy and the grower to sell and deliver to the association all the cotton produced or acquired by or for him in Texas during the years 1921, 1922, 1923, 1924, and 1925. The association was to endeavor to sell the cotton gradually as the spinning industry required, and at the best possible prices. The marketing agreement further provided that since a remedy at law for its breach was inadequate, the grower became liable for five cents per pound, middling basis, as liquidated damages, "for all cotton delivered, sold, consigned, withheld or marketed by or for him, other than in accordance with the terms" thereof. It also provided that, in the event the grower threatens a breach "of any provision regarding delivery of cotton, the association shall be entitled to an injunction to prevent breach," and that, if the association brings an action for the breach, or a threatened breach, "the grower agrees to pay to the association all costs of court, costs for bonds," traveling expenses, and reasonable attorney's fees.

The committee in charge of the program for organizing the association failed to secure the signatures of persons eligible to membership covering as many as 1,000,000 bales of cotton of the 1920 crop by July 1, 1921, and decided to proceed under the provisions of subdivision (b) of section 13 of the agreement, which provided that an organization might be perfected if signatures covering at least 500,000 bales remained uncanceled by August 1. Appropriate notices were sent out to the signers of the organization contract, after which it was determined by the committee that signatures covering as many as 500,000 bales of cotton for the 1920 crop remained uncanceled, and the corporation was organized on July 27, 1921, to become effective on August 1 following.

Some time later appellants, becoming dissatisfied with the manner in which the association conducted its business, filed this suit in the district court of Red River county in October, 1922. In their original petition they stated two distinct causes of action. In one they sought a cancellation of

their contract with the association on the ground of fraud and other conditions which need not be here stated. In the other they sought damages for the breach of a special contract under which they delivered to the association, for sale, 1,095 bales of cotton.

The first trial was upon a plea of privilege filed by the association, which was overruled, and that ruling affirmed on appeal. See (Tex. Civ. App.) 257 S. W. 935. Thereafter the association filed an amended answer and cross-action, in which the marketing agreement was pleaded and damages sought for its breach. The association also applied for and obtained a temporary injunction restraining the appellants from delivering their cotton to any one except the association. An appeal was prosecuted from that order by the appellants, and the judgment of the trial court was affirmed. See (Tex. Civ. App.) 283 S. W. 619. On June 14, 1926, just before the case was called for trial on its merits, appellants filed a first amended original petition. In that pleading they omitted all references to the written contract with the association which had been pleaded in their original petition, and confined themselves to an action for damages growing out of the manner in which the association handled the 1,095 bales of cotton mentioned as the basis of the second cause of action in the original petition. The association filed an amended answer, in which it excepted to the appellants' amended petition on the ground that it showed upon its face that it was barred by the statute of limitation. It also pleaded that any agreement with the appellants to handle their crop as nonmembers of the association was unauthorized by the charter of the corporation. In addition to a general denial, the association pleaded a cross-action, alleging a breach of the organization contract wherein the appellants agreed to become members of the association and to deliver their cotton to the association for the purpose of being marketed. In this cross-action the association asked for damages at the rate of five cents per pound for all cotton grown and not delivered by the appellants during the years 1921, 1922, 1923, 1924, and 1925, aggregating the sum of $60,000, and for expenses and attorney's fees.

The exception setting up limitation to the appellants' amended petition was sustained, and upon their refusal to amend their suit was dismissed. The trial then proceeded upon the cross-action of the association, the latter becoming the real plaintiff in the case. At the conclusion of the evidence the court withdrew the case from the jury and rendered a judgment in favor of the association for the sum of $37,783.15 as liquidated damages, $5,000 as attorney's fees, and $1,825 as expenses. The damages awarded were based upon the amount of cotton which the undisputed evidence showed was owned and grown, and not delivered, by the appellants during the years above mentioned. It is apparently conceded that this is not excessive, if the appellants may be held liable upon the organization agreement.

The order of the court sustaining the exception to the appellants' petition and dismissing their suit is the first error assigned and will be the first considered. Since that ruling is based upon the proposition that the cause of action set up in the appellants' amended original petition is materially different from either of those pleaded in the original petition, it will be necessary to compare those two instruments. Both petitions are lengthy, and for that reason their substance only will be here stated. The first cause of action set out in the original petition was abandoned in the amendment, and no reference whatever was made to the existence or the signing of the organization agreement. Appellants contend, however, that their amended pleading contains, in substance, the identical cause of action appearing as the second stated in their original petition—one for damages for breach of the special contract under the terms of which the association acquired possession of the 1,095 bales of cotton. That cause of action as pleaded in the original petition was, in substance, as follows:

That on or about January 7, 1921, the appellants, being joint owners of 1,095 bales of cotton, were by certain false representations published by the association induced to deliver their cotton to the association to be marketed under the following terms and conditions: (1) The association was to have the cotton properly classed by an expert, and the owners furnished with an invoice showing the classification. (2) The owners were to have a loan equal to $60 per bale, with interest at the rate of 6 per cent. per annum. (3) The cotton was to be sold in a separate pool "by and to itself," and no sale was to be made without first consulting plaintiffs as to the price offered. (4) When a sale was consummated, the plaintiffs were to be notified and furnished with a detailed report of the price at which each bale was sold. It is further alleged that when the agreement was made the cotton was stored in a warehouse at Clarksville, Red River county, Texas, but was later by agreement removed to a warehouse at Houston. After the delivery of the cotton to the association the latter advanced to appellants, as a loan, the sum of $56,760. The breach of that contract is thus stated:

"The plaintiffs further allege that while the defendant was holding the aforesaid cotton as bailee in trust for plaintiffs, it willfully, fraudulently and negligently failed and refused to comply with the terms and conditions upon which it obtained such possession and agency to sell in this, to wit: (1) It was guilty of gross negligence in the grading and classing of said cotton and thereby materially and manifestly undergraded the

same and wholly and completely neglected and disregarded its staple value; (2) it was not segregated and sold in a separate pool by and to itself, as agreed upon, but was classed and stapled and pooled with cotton of other growers of a lower and inferior variety, grade and staple; (3) it was sold without the knowledge and consent of the plaintiffs and over their protest and against their instructions not to offer said cotton for sale on the grade and staple as so reported by it to them; and (4) it failed and refused to report the price at which each bale sold; that plaintiffs do not know when and to whom and at what price each respective bale was sold and under what variety, grade and staple so sold, as defendant has steadfastly refused to tell and still conceals from plaintiffs such information, although repeatedly requested to know; that as soon as the defendant's classification was received it was at once notified by plaintiffs that they did not accept the class and staple so shown in memoranda sent them and for same not to be offered for sale; but that defendant knowingly and willfully disobeyed the instructions thus given and repudiated the contract so made and sold and disposed of plaintiffs' said cotton at a price averaging 18.07 cents per pound, ship side Galveston, as so reported by it, aggregating the sum of $101,107.54 and deducted therefrom the sum of $9.77 per bale, aggregating the sum of $10,698.15 as expenses and charges for handling and selling said 1,095 bales; that said cotton was being held by plaintiffs for a material advance in the market value thereof in order to avoid a serious loss thereon, of which the defendant had notice, and they were financially able to hold and carry same until the making of another crop, if necessary, for such advance and, on reasonable notice, able to secure and refund the advance so made by defendant together with the interest thereon and other proper and legitimate charges; that as soon as plaintiffs were notified of such sale and the price so received, as reported, they at once notified the said defendant that such sale was without their knowledge, authority or approval and that they refused to confirm and ratify the same and they then and there notified said defendant that they expected it to account to them for the highest price at which said cotton could have been sold between the date of sale and full report to them."

After alleging that the cotton could have been sold for 23 cents per pound on the market at Clarksville, plaintiffs asked for damages in the sum of $38,263.09. In an alternative prayer plaintiffs asked for the sum of $39,248.57, which allowed only what they claim was a reasonable sum as the expenses for handling the cotton, instead of the sum actually charged by the association.

In the amended petition filed on June 14, 1926, no reference is made to the written organization contract, but the same transaction involving the delivery and sale of the 1,095 bales of cotton on January 7, 1921, is set out as the basis of the suit. The amendment states precisely the same terms contained in the original petition as those upon which the cotton was delivered, and the same conditions under which it was to be sold and the proceeds accounted for. It also alleges the same misconduct on the part of the association in handling the cotton, the same breaches of the agreement, as were stated in the original instrument. Among other averments contained in the amended pleading is the following:

"That the price at which the defendant sold said cotton was very much less than its market value, and was very much less than the defendant could have sold said cotton for had it properly and in good faith carried out the contract so made by it with the plaintiffs, and had not been guilty of the breaches of said contract hereinbefore alleged, and had used reasonable care and diligence in the matter of handling and selling said cotton, as it was in duty bound by the terms of said contract; that if the defendant had carried out the terms of its said contract, and had not breached the same, as hereinbefore alleged, and had exercised reasonable care and diligence in carrying out said contract, according to its terms and provisions, it could and would have sold said cotton at and for a price of not less than 23¢ per pound, and in fact could have sold it for a greater price.

"The plaintiffs further allege that by breaching the said contract, as herein alleged, and selling said cotton as aforesaid, without the knowledge or consent of the plaintiffs, and in utter disregard of the terms and conditions of said contract, the defendant was guilty of a willful conversion of the said cotton."

While in their prayer for damages plaintiffs asked for judgment in the sum of $197,-687.71, that being the highest market price at which the cotton might have been sold while in the hands of the association, there was an alternative prayer for only the sum of $32,052.73, that being the difference between the price at which the cotton was sold and the price at which it might have been sold at Clarksville at or about the same time.

Counsel for appellee contend that the two causes of action as stated differed in these respects: The first is an action by members of the association for breach of contract, while the second is an action by nonmembers for a tort—conversion of property. It is true, as before stated, that the appellants in their original petition alleged membership in the association, and sought damages for breach of contract. It appears, however, that the contract which they claimed had been broken was not the general marketing agreement prescribing the relations and obligations of the association and its members, but a special oral contract entered into between the ap-

pellants and the association for the handling of a particular lot of cotton. The same special contract and its breach is the basis of the cause of action stated in the amended petition. Its date is the same, and the subject-matter is the same in both instruments. The same misconduct is alleged as constituting the breach and as causing the damages claimed. It is also true that in the amended petition the appellants alleged a conversion of their cotton, but they also in the same connection alleged the breach of the oral agreement as constituting the conversion. In their amended petition they use this language:

"That by breaching the said contract, as herein alleged, and selling said cotton as aforesaid, without the knowledge or consent of the plaintiffs, and in utter disregard of the terms and conditions of said contract, the defendant was guilty of a wilful conversion of the said cotton."

After carefully comparing the two pleadings we are of the opinion that the cause of action stated in the amended petition is, in substance, the same as that which also appeared in the original petition. A judgment based on one of those pleadings would bar an action on the other. The same evidence would sustain or defeat a recovery in a suit upon either instrument. There are alternative prayers for relief in the amended petition, one of which measures the damages sought by a rule applicable in suits for breach of contract. While membership in the association is not specifically alleged in the amended petition, there is nothing in its averments of fact which is inconsistent with such membership. We therefore conclude that the court erred in holding that the cause of action stated in the amended petition was legally different from that contained in the original instrument. We think the following cases support that conclusion: Phœnix Lumber Co. v. Houston Water Co., 94 Tex. 456, 61 S. W. 707; Lee v. Boutwell, 44 Tex. 151; W. U. Tel. Co. v. Brown, 62 Tex. 540; Ball v. Britton, 58 Tex. 63; Porterfield v. Taylor, 60 Tex. 264.

Counsel for the association insist that, even if there was error in sustaining the exception and dismissing the appellants' suit, the error was harmless, because their suit was founded upon a contract which the association had no power to make, or a transaction in which the officers of the association could not bind the association. That defense was presented by a plea in bar and must be considered in the light of the entire record. The charter of the association authorized it to engage in any activity "in connection with the harvesting, growing, handling, processing, storing, shipping, warehousing and marketing for domestic or export trade of cotton or cotton products of the association and of its members, and in financing any of said operations, to purchase and sell cotton, cottonseed, cotton products of its members," and to act as an agent, factor or broker for its members in any of the activities in which the association was authorized to engage. It appears that the defense of ultra vires is based upon the proposition that the appellants in their amended pleading did not allege membership in the association, but sued it as nonmembers, with whom the association could not contract in the manner alleged. As before stated, while the appellants did not allege membership, they stated no facts negativing membership. If the failure to aver membership in the association was a material defect, it was cured by the averments of the association in its answer and cross-action.

It is well settled that in passing upon the sufficiency of the plaintiff's petition to sustain a particular judgment, or to admit evidence of a particular fact, the pleadings of the defendant may also be taken into consideration. A material fact averred in an answer may be taken as curing the omission of the same fact from the plaintiff's petition. Lyon v. Logan, 68 Tex. 521, 5 S. W. 72, 2 Am. St. Rep. 511; Peoples v. Brockman (Tex. Civ. App.) 153 S. W. 907, and cases there referred to. In its answer in this case the association alleged at length all the facts essential to establish membership of the appellants in the association, set out the membership contract, complained of a breach of that contract, and sought and recovered damages for that breach. It would be a strange proceeding to deny the appellants the right to recover damages upon the ground that they were not members, and in the same case allow the association to recover because the appellants were members and had failed to comply with their membership contract. We do not regard the error as harmless.

We pass now to the consideration of those assignments which assail the judgment for damages rendered in favor of the association against the appellants. In view of the disposition made of the case, we shall discuss only the principal questions relied upon for a reversal of the judgment.

The proof shows that on June 30, 1921, H. H. Lennox signed the name of Lennox & Lennox, as joint tenants, to the organization agreement, which included the marketing contract, then being circulated. He also paid a membership fee of $10. The proof further shows that, when notified on the 7th day of July, 1921, that the committee had procured signatures covering as many as 578,000 bales and desired to incorporate at once, the appellants did not exercise their privilege of withdrawing their signatures. The corporation was formed on the ———— day of July, 1921, upon the condition that it would not begin to function until the 1st day of August following. After the incorporation the marketing contract was adopted by the association and became binding on all those whose names had not been withdrawn before August

1, 1921. It is conceded that the appellants failed to ship their cotton in accordance with the terms of the marketing contract, and are liable for the damages awarded in the trial below, if that contract was binding on them. They deny its binding effect upon the ground that the organization agreement was conditional, and that the conditions upon which the association was to be incorporated and adopt the marketing contract had not occurred. They specifically deny that on the 1st day of August, 1921, there remained uncanceled the number of signatures which were required to authorize the committee to proceed with the incorporation of the association for business.

In the trial of the case the appellee assumed the burden of proving that the requisite number of signatures had been procured and remained uncanceled on August 1, 1921. As proof of that fact the following certificate was offered in evidence:

"The organization committee of the Texas Farm Bureau Cotton Association, by its chairman, J. T. Orr, of Dallas, herewith states and certifies that the organization committee now has in its possession at the office of the Texas Farm Bureau Federation, standard association agreements covering more than 500,000 bales of cotton of the 1920 crop, viz. 552,095 bales, on which signatures have not been withdrawn or canceled by written or other notice, and that the Texas Farm Bureau Cotton Association may now notify the subscribers of the said contracts that all of said contracts are now binding upon the subscribers.

"Dated at Dallas, Texas, August 1, 1921. J. T. Orr, Chairman Organization Committee, Texas Farm Bureau Cotton Growers' Co-operative Marketing Association."

The trial court admitted that certificate and treated it as conclusive proof of the facts therein stated, basing his holding upon the following provision of the organization agreement: "For all matters of production or signature, and for all statements of fact in connection herewith, the written statement of the organization committee, provided for in paragraph twelve hereof, signed by its chairman shall be absolutely conclusive, with or without notice to the subscriber."

Appellants objected to the introduction of the certificate, upon two grounds: First, because it purported to be a statement emanating from J. T. Orr, acting for the committee, and not a statement of the committee signed by J. T. Orr as its chairman; second, because 4 of the 18 members of the organization committee were at the time directors of the new corporation, and for that reason were disqualified to act any longer as members of the organization committee. We think the court correctly overruled the objections and admitted the certificate in evidence. The probative effect of such certificates has been frequent subject of discussion by the courts in cases similar to this, and it has been uniformly held that in the absence of fraud such instruments are as between the parties conclusive proof of the facts they recite. Rowland v. Burley Tobacco Growers' Ass'n, 208 Ky. 300, 270 S. W. 784; Washington Wheat Growers v. Leifer, 132 Wash. 602, 232 P. 339; Pittman v. Tobacco Ass'n, 187 N. C. 340, 121 S. E. 634; Kansas Wheat Growers' Ass'n v. Bridges, 124 Kan. 601, 261 P. 570; Boettler v. Tendick, 73 Tex. 493, 11 S. W. 497, 5 L. R. A. 270; Carnegie Public Library Ass'n of Brownwood v. Harris, 43 Tex. Civ. App. 165, 97 S. W. 520. We think it unnecessary to refer to the numerous other similar cases cited in the brief of the appellee.

It is also contended that the contract was not binding on the appellants for these additional reasons: (1) That under the provisions of section 12 of the association agreement the propriety of organizing the association into a corporation was committed to a committee of 18 members who were required to act as a unit, whereas 5 of the members named were not present and did not participate in the proceedings when it was determined to complete the organization of this association; (2) that the incorporation of the association was prematurely consummated; and (3) that unauthorized and material changes were made by the committee in the organic features of the incorporation. While all of the members of the organization were not present at the time it was determined to incorporate, the record shows that more than a quorum was present, and there is no evidence that any of the absentees dissented or objected to what was done. The changes made by the organization committee were slight, and only such as they were authorized by the organization agreement to make. It is true the charter of the association was filed a few days before the 1st day of August, the time limit allowed for the withdrawal of signatures, but it did not begin to function till after that date. Since the appellants did not exercise their right of withdrawal before the 1st of August and do not attack the validity of the incorporation, they are not in a position to urge that slight irregularity, if it be one, as a reason why they should not be bound by the organization agreement.

Appellants further contend that they signed the organization agreement as joint tenants, and could only be held liable as such, whereas the trial court rendered a judgment against them as partners. The words "joint tenants" were written after the signature of Lennox & Lennox to the organization agreement. The concluding portion of that agreement, including the signature of the appellants, is as follows: "Read, considered and signed at Clarksville, Texas, this 30th day of June, 1921. Growers—Lennox & Lennox, as joint tenants. Production in 1920 was 600 bales." The use of the word "Growers" indicates that more than one person was meant

by the signature "Lennox & Lennox." The proof shows that after signing the agreement appellants conducted their principal farming operation upon land which they owned jointly and in the same manner as before. They state in the agreement that they had grown 600 bales during the year 1920. The cotton which they failed to deliver to the association, and which the court held should have been delivered, was grown upon the same jointly owned lands and under the same joint arrangements between themselves which obtained during the year 1920 and for many years before that time. We think the evidence fully warranted the court in concluding that they were jointly and severally liable for the failure to deliver the cotton under the terms of their contract.

There are other propositions urged by appellants, but to discuss them in detail would unnecessarily extend the length of this opinion. We have examined them carefully, and have concluded that they should be overruled. Appellee contends that, whatever irregularities there may have been in the organization of the corporation and the adoption of the marketing contract, such irregularities were waived by the appellants. As proof of such waiver reference is made to the fact that after the association had been organized the appellants delivered to it some of their cotton, on which they obtained loans of money from the association—a course of dealing which could be legally conducted only between the association and its members. There is, we think, much force in the contention. In the light of the entire record, we cannot say that the court erred in holding the appellants bound by the terms of the marketing agreement.

But for the error in sustaining the exception to the appellants' amended original petition, and in dismissing their suit, the judgment will be reversed and the cause remanded for a new trial.

### On Motions for Rehearing.

Both the appellee and the appellants have filed motions for rehearing. In their motion the appellants reiterate practically all of their original assignments attacking the judgment rendered against them on the cross-action of the association.

As before stated, that judgment consists of two distinct forms of relief. One is an award of $37,783.12 as damages for the breach of the marketing agreement by appellants in failing to deliver their cotton for the years 1922, 1923, and 1924. The other is a decree directing the appellants to perform the marketing agreement. While adhering to our former conclusion that the record justified the action of the trial court in awarding damages against the appellants for breach of contract, we have concluded that there was error in decreeing specific performance and in perpetuating the writ of injunction, without a finding of the essential facts by the jury.

The evidence shows that the cotton affected by the injunction and decree of specific performance was grown by appellants' tenants during the year 1925. It consisted of 1,664 bales then in storage in the warehouse of the Clarksville Storage Company, a bonded warehouse. The evidence further shows that the receipts issued for the cotton were delivered to and held by the First National Bank of Clarksville to secure money borrowed from the bank and used by appellants in purchasing their tenants' interests in their crops. C. D. Lennox testified that they loaned money to their tenants during the year to enable them to make and gather their crops. In the fall, when the cotton was ready for market, they often purchased the tenants' interest in the cotton. The money used in making those advances and purchases was borrowed by appellants from the Clarksville bank. When advances were made to tenants, notes of the tenants were taken, and these were secured by mortgages on the tenants' part of the crop. Those notes were turned over to the bank as collateral security for the money borrowed and used in making the advances. When cotton was purchased from tenants in the fall, it was stored in the Clarksville warehouse in the name of appellants, and the receipts issued therefor were delivered to the bank. He said: "The cotton warehouse receipts that were put up as the cotton was acquired was to secure the money for the making and the gathering of the crops and whatever amount of money we had paid the tenant for his interest in the cotton. We had that arrangement each year, and especially for 1922, 1923, 1924, and 1925."

The record justifies a finding that the 1,664 bales of cotton in the Clarksville warehouse consisted in part of cotton received by the appellants as rent for the use of their land, and in part of cotton purchased by them from their tenants. How much of that was rent cotton, and how much was purchased from tenants, is not disclosed by the record. But the evidence warrants the inference that a considerable portion of it was acquired by appellants by purchase in the fall of 1925.

It may be conceded that all the cotton delivered to appellants as rent was subject to the terms of the marketing agreement and should have been turned over to the association when ready for marketing. The failure to make such delivery would, to say the least, subject the appellants to an action for damages for breach of the marketing agreement. While mortgaging the rent cotton to the bank for borrowed money, and thus placing it beyond appellants' control, might render a suit for specific performance an inappropriate remedy, it would be no defense to an action for damages for breach of contract.

But the question we shall now discuss is: Was that part of the cotton held in storage,

which the appellants had purchased from their tenants after the crops were grown, subject to the provisions of the marketing agreement? The marketing agreement binds the grower "to sell and deliver to the association all the cotton produced or acquired by or for him in Texas during the years 1921, 1922, 1923, 1924, and 1925." The cotton must be delivered "at the earliest reasonable time after ginning, to the order of the association, at the warehouse controlled by the association, or at the nearest public warehouse if the association controls no warehouse in that immediate district, or by shipment as directed to the association, and by delivery of the endorsed warehouse receipts or bills of lading properly directed." The association agrees to resell the cotton wherever a suitable market may be found, and, after deducting certain specific expenses, to pay the remainder to the grower. The marketing agreement also authorized the association to borrow money "in its name, on the cotton, through drafts, acceptances, notes, or otherwise, or any warehouse receipt or bill of lading, or upon any accounts for the sale of the cotton, or on any commercial paper delivered therefor."

The liability of the appellants for the nondelivery of that portion of the cotton purchased from their tenants depends on the construction that should be given to the word "acquired" as used in the marketing agreement. The cotton purchased was not produced by or for the appellants, and did not become subject to the provisions of the marketing agreement, unless it was "acquired" within the meaning of that instrument. The proof shows that at the time of the trial the appellants owed the bank the sum of $188,852.36, which had been borrowed and used in making advances and in purchasing cotton from their tenants. In accordance with an agreement entered into at the time the loans were made, the bank held negotiable warehouse receipts issued as the cotton was purchased and stored. As holders of those receipts the bank occupied the status of a mortgagee in possession. Osborn v. Koenigheim, 57 Tex. 92; Campbell & Clough v. Alford et al., 57 Tex. 159; Nat. Bank of Cleburne v. Citizens' Nat. Bank of Cleburne, 41 Tex. Civ. App. 535, 93 S. W. 209; White v. Jacobs, 66 Tex. 464, 1 S. W. 344; Schmick v. Bateman, 77 Tex. 330, 14 S. W. 22. The possession of the bank could not be disturbed, or the cotton removed, without the bank's consent, until the mortgage debt was satisfied. When the mortgagee is in possession of the mortgaged property the mortgagor must be out of possession. If the mortgagee may object to a delivery of the cotton to the association for the purposes contemplated in the marketing agreement, the mortgagor cannot make such delivery. Hence it follows that, to enable a grower to deliver to the association cotton "acquired" by him the acquisition must be full and complete, not only of the title, but of

the right of possession, as well, unhampered by any restrictions. Until the grower attains that status, he has never "acquired" the cotton, so as to enable him to comply with his contract. To "acquire" cotton for delivery means to acquire the legal right and power to make a delivery. That legal right and power had never been acquired by the appellants over the cotton purchased from their tenants. The liens held by the bank grew out of and were a part of the very transactions in which the cotton was purchased. The situation would be materially different if the appellants had once acquired the title and the right of possession and control of the cotton, and had afterward mortgaged it to the bank. The grower could not in that manner evade his obligation to perform his contract.

It is no argument to say that appellants have the right to pay the mortgage debt and thereby acquire full dominion over the cotton. The controlling question is, not what the appellants have the right to do, but what they *obligated* themselves to do. The marketing agreement does not bind them to acquire cotton. They have the option to acquire or not acquire, as they see proper. As a necessary incident to that option they have the right, in contracting for the purchase of cotton, to make any terms or agree to any restrictions or conditions upon which the title or the full dominion over the purchased cotton may pass. Not being bound to begin a contract of purchase, they are not bound to carry through to completion one which has been partially performed, or to perform a condition which they were under no obligation to assume. They cannot be compelled to finish an undertaking which they were not bound to begin.

Let us suppose that the mortgagee bank should foreclose its lien and sell the mortgaged cotton to some party other than the association: Would such a sale operate as a breach by appellants of their contract with the association? We think not. In selling under the foreclosure the bank would be merely exercising a right which grew out of the contract of purchase—the assertion of a power which had its incipiency in the very transaction through which a title to the cotton was acquired by the mortgagor. A contract of purchase is never completed till the purchase price is paid, and the purchaser may agree that the seller, or one who furnishes the purchase money, may retain possession until payment is made in full. That agreement was made by the appellants in this case. The sellers delivered the cotton to the warehouse, took receipts, and later turned the receipts over to the bank, in accordance with an agreement previously made between the bank and the appellants. The right of the grower to incumber his crop of cotton before it is grown, or while it is growing, is recognized by the following provision of the marketing agreement:

"If the grower places a crop mortgage up-

on any of his crops during the term hereof, the association shall have the right to make delivery of the cotton and to pay off all or a part of the crop mortgage for the account of the grower, and to charge the same against him individually. The grower further agrees that, if the mortgagee desire, he will execute in favor of the creditor an assignment of his interest in the cotton which he has sold or will sell to the association for the protection of the creditor to the extent of the creditor's just claim. And the association in turn agrees, upon notice of such assignment, to respect the same and to pay to the creditor to the extent of his just claim the proceeds otherwise due the grower."

That provision is in harmony with the conclusion that the grower's obligation is limited to unincumbered cotton, unless the association agrees to assume or settle the mortgage debt. No such offer was made by the association in this case. On the contrary, its demand is that the appellants be required to make immediate and unconditional delivery of all the cotton stored in the warehouse in appellant's name. As we have seen, that cannot lawfully be done without the consent of the bank holding the liens and warehouse receipts. Since no such consent has been given, the .order asked for could not be complied with.

But the remedy of specific performance is never applicable where there is no obligation to perform. If the conclusions previously stated are correct, the appellants are not bound by any contract to deliver the cotton which they purchased from their tenants and which is still under mortgage to the bank. When the mortgage debt is paid, and appellants acquire full dominion over the cotton that obligation may arise.

In asking for a specific performance of the marketing agreement, it devolved upon the association to prove a state of facts which would enable the court to grant that form of relief without requiring appellants to do something which they were not obligated to do. If, in order to enable the court to render such a decree, it was necessary to designate the particular cotton to which the order should apply, the association has failed to make out its case. It has not attempted to distinguish between the cotton delivered to appellants as rent from that which they contracted to purchase from their tenants. The injunction granted is far-reaching; it prohibits the appellants from disposing of any portion of the stored cotton otherwise than by a delivery to the association.

According to the testimony of the appellants, they borrowed the money for which the entire 1,664 bales of cotton were mortgaged because they did not have sufficient funds to make the advances to their tenants and to purchase their tenants' interest in the cotton in the fall of the year. There is nothing in the record to indicate that appellants are now financially able to pay that debt and redeem the cotton without a sale of the mortgaged cotton. They are therefore in a position where they cannot comply with the order of the court requiring an immediate and unconditional delivery of all the cotton in the warehouse to the association. "Since a court of equity will not do a useless thing or make a nugatory decree, specific performance will not, as a rule, be decreed against a vendor who is unable for want of title to comply with his contract; and this is true, although the want of.title is caused by the defendant's own act, as by his conveyance to a bona fide purchaser." 25 R. C. L. p. 245, and cases referred to. The principle there announced would justify the court in refusing to direct the specific performance of any of the cotton incumbered with a mortgage and in possession of the mortgagee. The practical inability of the appellants to obey such an order would warrant a refusal to make the order. However, that situation would not exempt the appellants from liability for damages in failing to deliver cotton which was subject to the terms of their contract.

That part of the judgment which awarded damages against the appellants for the failure to deliver cotton grown and acquired by them during the years 1922, 1923, and 1924 will not be disturbed; but the order directing appellants to specifically perform by delivering all of the 1,664 bales of cotton in the warehouse, and perpetuating the injunction, will be set aside and the injunction dissolved. To that extent appellants' motion is granted. In other respects it is overruled.

For the reasons stated, the cause will be remanded for a new trial.

WILLSON, C. J. (dissenting). I think the conclusion reached when the record was first before this court, that there was no error in the judgment so far as it was in appellee's favor on its cross-action against appellants, was correct. Having reached that conclusion, this court should (I now think) have affirmed that part of the judgment and have remanded the case to the court below for a trial only on appellants' claim for damages. Rule 62a for Government of Courts of Civil Appeals; Dutton v. Miller (Tex. Civ. App.) 11 S.W.(2d) 551; Miller v. Wolff Mfg. Co. (Tex. Civ. App.) 225 S. W. 212; Durham v. Scrivener (Tex. Civ. App.) 259 S. W. 606. Believing this court erred when it did not do that, I do not agree with the majority that appellee's motion should be in all respects overruled. I think, instead, it should be granted, so far as it complains of the action of this court in the respect stated, and that the judgment rendered here, so far as it reversed that part of the judgment, should be set aside, and that part of the judgment of the court below affirmed instead.

The opinion now entertained by the majority, it appears from Judge HODGES' opinion

overruling appellee's motion, is that there was error in the judgment in appellee's favor on its cross-action, in that there was an issue for determination by the jury as to whether appellants "acquired" the 1,664 bales of cotton referred to in said opinion, within the meaning of that word as used in the marketing agreement. I think there was no such issue, in view of allegations as follows in the pleadings of appellants on which the trial was had:

"Now come H. H. and C. D. Lennox, and, leave of the court being first obtained, file the following trial amendment, so that in addition to the allegations of paragraph 18 of plaintiffs' first amended first supplemental petition, after the words 'and should be dissolved' the following allegations are made, to wit, that at the time said injunction was so issued against them they owned or had liens upon and now have and did have prior to January 1, 1926, in hands for sale either jointly or severally 1,590 bales of cotton weighing in the aggregate 806,973 pounds; and that prior to January 1, 1926, they became sole owners of said 1,590 bales, that in addition to the said number of bales owned and acquired by plaintiffs prior to January 1, 1926, they owned and were interested in, and in the actual possession of with authority to sell, which had been delivered to them prior to January 1, 1926, the following list of cotton, to wit: W. L. Gaines, 20 bales, weighing 10,542 pounds, all of which was at the Clarksville storage in the name of Lennox & Lennox prior to January 1, 1926, except one bale of the 1925 crop which was delivered in 1926 and weighed 511 pounds; Jack Curlee, 9 bales of cotton, weighing 4,755 pounds, all of which was at the Clarksville storage in the name of Lennox & Lennox prior to January 1, 1926, except one bale weighing 528 pounds, delivered to them on April 17, 1926; Tom Bales, 22 bales of cotton, weighing 11,356 pounds, was on said storage platform in the name of Lennox & Lennox prior to January 1, 1926; J. L. Shirley, 20 bales of cotton on said platform in the name of Lennox & Lennox, weighing 10,474 pounds; Ambrose Jones, one bale of cotton, delivered to Lennox & Lennox on December 9, 1925, weighing 463 pounds; E. B. Beard, three bales of cotton, weighing 1,268 pounds, all of which were produced in 1925 and delivered to Lennox & Lennox and acquired by them prior to April 1, 1926; that the interest owned by plaintiffs in the foregoing 74 bales of cotton was, and is, an undivided one-fourth interest in 31 bales, aggregating 15,760 pounds, and an undivided one-half interest in 43 bales, of said list of 74 bales, aggregating

22,031 pounds; that against the balance so owned by said tenants the plaintiffs H. H. and C. D. Lennox owned and held and still own and hold valid, subsisting and unsatisfied landlords' liens and chattel mortgage liens against the respective tenants as follows, to wit: W. L. Gaines the sum of $1,219.78; Jack Curlee the sum of $413.82; J. L. Shirley the sum of $1,431.07; Ambrose Jones the sum of $390.00; Tom Bales the sum of $1,590.07; that the aforesaid cotton was pledged and delivered to plaintiffs with the understanding and agreement that same should and would be sold, and plaintiffs were authorized to sell same when plaintiffs' undivided interest therein should be sold and the proceeds from the sale of their undivided interest therein be applied on their respective debts and accounts."

It seems to me that the allegations of appellants that they "became the sole owners" of 1,590 of the 1,664 bales of cotton and that "in addition to the said number of bales owned and 'acquired'" by them they "owned and were interested in and in the actual possession of with authority to sell" the other 74 bales of the 1,664 bales, conclusively showed that appellants had "acquired" the cotton, and relieved appellee of the burden of proving the fact. If such was the effect of the allegations, if there was a reason why, having "acquired" the cotton, appellants nevertheless should not be required to comply with the terms of the marketing agreement as to the delivery of the cotton or a part thereof to appellee, the burden of showing it, and the part, if less than the whole, certainly was on appellants and not on appellee.

The provision in the marketing agreement entitling appellee to the remedy of specific performance might easily become meaningless, if construed as the majority have determined it should be construed. A grower who had become the owner by purchase of hundreds of bales of cotton could successfully defend against the association's suit to compel him to deliver the cotton to it by proof that he owed a trivial part of the purchase money thereof, payment of which was secured by a mortgage thereon. Indeed, the effect of the ruling of the majority, it seems to me, is to relieve the grower of proving even that much, and to require the association, in proving that the grower had "acquired" cotton purchased by him, which it claimed to be entitled to, to show that the cotton was wholly unincumbered by liens of any kind. As the writer views it, such a requirement is unreasonable and is not warranted by any principle of law.